## Case No. 9,057.

### MANY v. SIZER et al.

[1 Fish. Pat. Cas. 31.] [1]

Circuit Court, D. Massachusetts. June, 1849.

FEDERAL COURTS — COMITY—WHEN NOT APPLICABLE—EFFECT OF VERDICT—CONSTRUCTION OF PATENT—INJUNCTION.

1. The rule of comity which requires judges of the federal courts to conform to the opinions of each other, if any have been given, has no application either by its terms, or the reason on which it is founded, to motions for injunctions where error may be followed by irremediable mischief.

2. The rendition of a verdict in a patent case in favor of a plaintiff is not conclusive, upon the right of such party to an injunction.

3. The question is not, what might have been done, but what has been done by the patentees. And although the court will endeavor, ut res valeat, so to construe the patent as to make it co-extensive with the invention, yet the language used may be too clear to be controlled by any extrinsic evidence.

[This was a suit by William V. Many against George W. Sizer and Henry Sizer to enjoin the infringement of letters patent No. 640 granted to Trescott, Wolf, and Dougherty, March 17, 1848. The cause is heard on a motion for a provisional injunction founded upon the verdict of the jury in an action of trespass on the case between the same parties. Case No. 9,056.]

B. R. Curtis, for complainant.

A. McArthur and Rufus Choate, for defendants.

SPRAGUE, District Judge. This application is founded upon the result of the recent trial between the same parties. Exceptions having been allowed in that case, the numerous questions of law which arose in it are yet to be decided by the supreme court. In the mean time the plaintiff prays for an injunction. On the one hand, if the right be in him, although he may have an action for damages, that remedy may be inadequate. On the other hand, if the defendants should be prohibited from carrying on the manufacture in which they are now engaged, and the right should ultimately be decided to be in them, they would have no remedy for the loss sustained by arresting their business. Is the plaintiff's right so clear, and the presumptions in his favor so strong, as to entitle him to the interposition which he now asks? This requires an examination of the questions raised by the exceptions. The first and most important is that which relates to the construction of the plaintiff's patent. At the trial the plaintiff's counsel presented an authenticated report of a trial upon the same patent before the United States circuit court, at Albany, in October last, and insisted that the rulings therein had not only all the weight which the learning and ability of the judges would have given them under any cir-

1 [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

cumstances, but became obligatory by virtue of the rule laid down in Washburn v. Gould [Case No. 17,214], where it is said, "the rule of comity always observed by the justices of the supreme court, in cases which admit of being carried before the whole court, was to conform to the opinions of each other, if any had been given." And Judge Story accordingly adopted a previous ruling made by Mr. Justice McLean. That case was also an action upon a patent, and precisely applicable to the question before me, and I felt bound to conform to a rule established by all the judges of the supreme court. Having thus concluded to adopt the construction of the patent given in the circuit court at Albany, the plaintiff was entitled to the full benefit thereof, and I did not deem it proper to weaken its force by arguments against it, but contented myself with indicating to counsel that it was the result of authority rather than of my own judgment. The above rule of comity has no application either by its terms, or the reason on which it is founded, to motions for injunctions where error may be followed by irremediable mischief. And I am now compelled to consider the true interpretation of the plaintiff's patent without the relief of any previous binding exposition.

At the close of their claim, the patentees state their claim in the following words: "What we claim as our invention, and wish to secure by letters patent, is the manner of constructing wheels for railroad cars, or for other purposes to which they may be applied, with double convex plates, one convex outward and the other inward, and an undivided hub, the whole cast in one piece, as herein fully set forth." The plaintiff, by his counsel, contends that his patent is not for an organized machine, nor for a combination, but for a unit or whole, to the making of which, however, he says certain ingredients or parts are essential, which are a drilled rim, solid hub, two plates connecting the rim and hub, and so far apart as to operate as a brace, the one for the other, all cast at one time, so as to constitute one substance, and the plates curved to such a degree that, in the process of casting, they would first yield to the pressure of the circumference in chilling the rim, and afterward contract in the process of cooling, without fracture. And further, that this claim is not limited to any one kind of curvature, or any particular location of it, or any arrangement of the plates, that the curvature may be wholly between the center and circumference, and the plates may be both convex inward or both convex outward. By the plaintiff's construction, his claim is not merely for the result—the article—the wheel, after it has been made, possessing certain mechanical powers or properties, as two plates connecting the rim and hub, and supporting both, placed far enough apart to act as a brace, the one for the other —for the pre-existing Elgar wheel had all these properties. The plates of that, how-

ever, were wrought and fastened to the rim and hub with bolts and screws.

The plaintiff therefore proceeds further, and claims a wheel made by the process of casting, nor does he stop there, because the Baldwin wheel, if indeed that did not end in mere experiment, which would be a question of fact for the jury, was a double-plate wheel, cast all at one time, and the plates far enough apart to support the rim and hub, and to brace each other. But the plates were not so curved as to obviate the difficulty of contraction in cooling, and the plaintiffs proceed still further, and claim that their patent introduces that compensating principle as it has been called. The defendant insists that in his plates the curvature is wholly between the center and circumference, and that all the convexity is inward. The plaintiff contends that by the true construction of his claim, which has been above quoted, the words "double convex plates" and "an undivided hub, the whole cast in one piece," are to be operative and essential, but that the words, "one convex outward and the other inward" are to be inoperative.

It is to be observed, that the language which indicates that the plates are to be curved is "double convex plates." The question arises whether a plate, as a whole, may be said to be convex, by reason of wrinkles or minor curvatures between the center and the circumference, leaving the center still in in the plane of the circumference. This question is not unimportant, and some light may be thrown upon it by extrinsic evidence hereafter to be adverted to. Without pausing upon it here, let us proceed to the inquiry whether the words "one convex outward and the other inward" are to be rejected as inoperative. These words are as clear and imperative as any part of the summing up. If it be said that they relate to form, so does the word convex which immediately precedes them and is essential to the plaintiff's claim. Shall then the words "with double convex plates" be retained, and the words which immediately follow, qualifying them and prescribing the kind of arrangement of convex plates, be rejected? Shall a single sentence of this prescribed form be thus dissevered, and thereby give to the plaintiff the right to double convex plates generally, instead of such double convex plates as he has specified?

The patentees commence their summing up by saying that what they claim as their invention, and wish to secure by letters patent, is the manner of constructing wheels, etc., and close it by words "as herein set forth," referring to the preceding specification, which is to be carefully examined, and the whole instrument construed together. The specification is as follows: The patentees begin by saying that their invention is a new and improved mode of constructing cast-iron wheels, etc., and then proceed to give a full description of such mode, in which it is said that the wheel is to be cast with two parallel, or nearly parallel plates, which plates are convex on one side and concave on the other. Here again the plates are to be convex, but instead of saying the one is to convex outward and the other inward, they are required to be "parallel, or nearly so," which can not be unless they are bent in the same direction, that is one convex outward and the other inward. The language as imperatively requires that they shall be parallel, or nearly so, as that they shall be convex. The illustration by the drawing also represents them as parallel.

Thus far the specification seems to be in exact conformity with the summing up, but it has been urged that the subsequent reference to the curved arms of cast-iron wheels suggests the idea that the curvature of the plates may be the same as had previously been known in such arm. If this were so it might affect the question, whether the convexity was to be of the plate as a whole, that is between rim and rim, or might be a curvature between rim and hub only, but would not reach the question of the parallelism of the plates. But let us see what is the real force of this reference. It reads thus: "In consequence of the particular form given to the plates, they contract in cooling, without danger of fracture, and without its being necessary to divide the hub as is done when car wheels are cast with spokes or arms. The only effect of contraction is to flatten the two plates in a slight degree, operating in this respect like the curved arms of many cast-iron wheels." Here is nothing waiving or varying the form previously prescribed, but only an explanation of the effect of that particular form, namely, that it allows of contraction, and then states the result of that contraction, viz., the flattening of the plates, and as an illustration refers to the curved arms of cast-iron wheels. It does not say that they adopt the form of such arms, but only that the particular form which they have previously described will, in one respect, viz., that of flattening the plates, operate like such curved arms.

The language of the summing up, so far from being inconsistent with the preceding specification, seems to be fully sustained by it.

Let us now advert to the extrinsic evidence, and see what aid we can derive from the history and condition of the art at the time the patent was granted, and read it by the light of surrounding circumstances. It is urged with much force by the plaintiff's counsel that the only form of the plates, which is essential, is such curvature as will allow the metal to contract in cooling without danger of fracture, and that any particular form and arrangement of the plates beyond this, being unnecessary, should not be deemed an indispensable part of the patent. But was it known at the time that this patent was obtained, that a particular arrangement of the plates was not necessary; or was the

method of introducing a second plate, so as to obviate contraction, an essential part of plaintiff's invention?

Has not the fact now relied upon—viz: that that mode is not essential—been of recent discovery? It must be borne in mind that the question is not, what might have been done, but what has been done by the patentees. We must endeavor, therefore, to ascertain, in the first place, what their invention really was, and in the next, how it is described by the patent. The patentees may have claimed either more or less than their real invention. And, although the court will endeavor ut res valeat, so to construe the patent as to make it coextensive with the invention, yet the language used may be too clear to be controlled by any extrinsic evidence, and the statute itself contemplates that errors of description may exist beyond the power of the court to correct, and provides a remedy by a surrender of the patent.

What, then, is the extent of the plaintiff's invention? What was the defect which they undertook to remedy, and in what manner did they do it? Wheels with chilled rims, solid hubs, double plates supporting both edges of the rim and both ends of the hub, and operating as a brace one to the other, were previously known.

Such was the Elgar wheel before mentioned; but the plates were wrought and expensive, and it was desirable that the wheels should be made by casting, and to this a difficulty was presented by the contraction of the metal in cooling. Baldwin had made by casting a double-plate car-wheel, but the plates were not curved so as to obviate the difficulty in cooling, and it is a question whether his attempts did not end in experiment only. Cast-iron wheels with curved arms connecting the rim and hub, and made in that form to allow contraction in cooling, were well known. James made and introduced into successful use a car-wheel with a chilled rim, solid hub, single plate connecting the rim and hub, and convex on one side and concave on the other, so as to allow contraction in cooling, and all cast at one time. Now it is insisted on behalf of the defendants, that as double-plate wheels, having all the mechanical properties of the patentees', namely, supporting the rim and hub, and acting as a brace before mentioned, had been made by Elgar, and were well known, and the idea of making them by casting had been conceived by Baldwin, who failed of carrying it into successful effect only for want of curvature, and such curvature had been actually introduced by James into his one plate wheel, that all the plaintiff did was to introduce into the James wheel a second plate exactly like the first. And it is further insisted, that in this there is not a sufficiency of invention to support a patent. Let us see what difficulties presented themselves, and how the patentees overcame them. All the experts agree that it is necessary that

the tread of the wheel should be hardened, and for this purpose must be cast in a chill, that is, that the part of the mold which comes in contact with the exterior surface of the rim should be made of some good conductor of caloric, while all other parts are made of some non-conductor. The rim being thus suddenly cooled is thereby made to contract, and the circumference is diminished, producing a pressure upon the whole mass of interior metal, while it is yet in a highly heated and flexible state. The effect in this first contraction would be in the James wheel to increase the convexity of the plate, causing the central portion or hub to rise, and then by the subsequent cooling of the interior the convexity would be diminished and the hub or center would fall, and to such extent that the plate would at last be somewhat more flattened than it was as originally molded.

If a second plate were introduced and placed in such relation to the first that both would be convex outward, and they were not connected at the center but only at the rim, then both plates would readily yield to the first contraction of the circumference, both rising and receding from each other at the center, and by their subsequent contraction both falling and approaching each other at the center. But if the plates were connected by a solid hub this would counteract the effects of both the first and second contraction, and prevent the plates from receding from each other at the center in the first place, or approaching each other afterward. If the two plates were made both convex inward and not connected at the hub, they would approach each other at the center by the first contraction, and recede by the second; but if connected by a solid hub, both these operations would thereby be prevented. A solid hub was essential, and the plan adopted by the patentees was to place the second plate parallel to the first, one being convex outward and the other inward. The effect of the first contraction would be to increase the convexity of both equally, and as the center of both would rise in the same direction, the solid hub would present no obstruction. So also both would fall together by the subsequent cooling of the plates, and their parallelism be preserved throughout. And thus the principle of compensation by curvature to allow of contraction in cooling, without fracture, would, notwithstanding the solid hub, have free operation according to the extent or degree of the convexity. This is the mode adopted by the patentees as set forth in their specification, illustrated by their drawings, and claimed in their summing up. This is the mode the patentees always adopted in practice. They manufactured their wheel more or less from the date of their patent in 1838 to the year 1843 inclusive, making in all about eight hundred. In some of them, the plates instead of being convex from rim to rim were conical, that is, the line from rim to hub was straight, and the

center was not in the plane of the circumference. Both were conical in the same direction, and their parallelism preserved, and the effect of the successive contractions was to raise and depress the hub or center of both just as in the parallel convex plates. The manufacture was discontinued in 1843, and not resumed until after the plaintiff had become the purchaser of the patent in 1847, when about eleven hundred were made under the plaintiff's direction, all by the same method as that pursued by the original patentees.

The defendants contend that in 1848, by their own skill and labor, they found out a new method of constructing the plates by placing the curvature in both wholly between the hub and rim, leaving the center in the plane of the circumference, and the curvature of both being inward, and that this, by allowing a greater degree of curvature, gives more beneficial operation to the principle of compensation, and causes the plates to brace each other more effectually against one kind of lateral pressure, and that they have thus produced a wheel of greater practical utility, while they insist that the plaintiff's is not superior to the old spoke wheel.

Now if this be so, and there was certainly evidence tending to prove it proper for the consideration of a jury, why should not they have the benefit of the method of constructing the plates which they have introduced, leaving to the plaintiff the exclusive benefit of the method set forth in the patent? Why should the plaintiff's claim be so extended as to embrace a new and more useful method of construction, which the patentee had never described or acted upon? The plaintiff's counsel have made a forcible argument upon that part of the instruction which stated that if the defendants' was in any material part substantially different from the plaintiff's invention, as described in his letters patent, there was no infringement. This taken alone might at first view seem to be sufficiently favorable to the defendants. But it does not stand alone—the jury were not left at liberty to form their own judgment of what was a substantial difference. They were peremptorily instructed that any changes of form or arrangement of plates, even if thereby the plates were both convex inward or both convex outward, and the curvature placed wholly between hub and rim, and producing thereby a result more useful, would not constitute a substantial difference, but that there must be also the introduction of some new principle or mechanical power, or new mode of operation producing a new kind of result. And it was not until this direction had been emphatically repeated to the jury, after they had been deliberating more than twenty hours, that they finally agreed upon a verdict. The jury were, indeed, instructed that increased utility would be evidence tending to prove such new principle, power, or mode of operation, and the

greater the utility the stronger would be such evidence, and that a manifest and very high degree of utility would be conclusive evidence thereof. The jury may have deemed the defendants' wheel more useful than the plaintiff's to any extent short of what they might consider a manifest and very high degree of utility.

As I understood the ruling of the circuit court at Albany, and the authority in Washburn v. Gould [supra], I felt constrained to instruct the jury, as before stated, as to the necessity of some new principle or mechanical power, etc., being introduced by the defendants. Should not the instructions have been more favorable to them? If it should be thought that the case of Davis v. Palmer [Case No. 3,645], decided by Marshall, C. J., presents too rigid an adherence to form to be a guide for the present, ought not the court to have followed the decision of the supreme court in Prouty v. Ruggles, 16 Pet. [41 U. S.] 336, and held the plaintiff to the particular instrumentality which he had specified and claimed, whether the defendants' article was more useful or not? Or even if this high authority should be deemed too rigorous, and a more liberal doctrine in favor of patentees should be adopted, ought not the jury at least to have been told that if the defendants, by the method or the changes introduced by them, had carried the principle of compensation and the mechanical power of the brace into more full and complete effect, and had thus conferred a benefit upon the public by making a better and safer wheel, and that these changes and increased utility might be well termed considerable—it was no infringement, although no new principle or power was introduced, and the new mode of operation had produced a beneficial effect, new only in degree and not in kind?

In the case just referred to [Davis v. Palmer], the patentee claimed an improvement in the mole-board of a plow. In his specification, there was first a general and then a more particular description of the form of his mole-board. The plaintiff contended that he was not restricted to the latter and more particular description. Chief Justice Marshall held otherwise.

The case of Prouty v. Ruggles, 16 Pet. [41 U. S.] 336, bears so strongly upon the question now before the court, as to require a particular examination. The patent was for a combination of three things in the construction of a plow, and the whole cause turned upon the question whether the patentee was confined to the particular manner of constructing the top of the standard which he had described in his specification, which was as follows. After describing the other two particulars of the combination, he says: "The top of the standard through which the bolt passes to secure the beam, is transversely parallel to the plane of the share, and extends back from the bolt to such distance as to form a brace to the beam when the

after part is pressed down by lifting at the fore part, the share being fast under a rock or other obstruction. The after part of this extension is squared in such manner that, being jogged into the beam, it relieves the bolt in heavy draft."

In summing up, the patentees say they claim a combination of three particulars. After describing the first and second, they proceed as follows; "3d. The forming the top of the standard for brace and draft. We do not intend to confine our claim to any particular form or construction, excepting such form of the top of the standard as shall serve for brace and draft, but have given such form as we deem to be most convenient, which may be varied as is obvious." The utility of the invention and the validity of the patent were admitted. It appeared that the defendants had made plows embracing the first two elements of the combination, and also having the top of the standard so formed as to serve both for brace and draft, but it was not jogged into the beam, and did not extend so far back upon the beam. It was decided by Judge Story at the trial, and afterward by the whole supreme court, that the patentees were to be held to the mode of forming the top of the standard described in the specification.

The chief justice, in delivering the opinion of the court, holds this language: "The use of any two of these parts, only, or of two combined with a third which is substantially different in form, or in the manner of its arrangement and connection with others, is therefore not the thing patented." Compare this decision for a moment with the case at bar. In the former, the specification describes the mode of forming the top of a standard for brace and draft, to be by extending it and jogging it into the beam. In the latter, it describes the mode of constructing the wheels to be by convex plates placed parallel to each other, or nearly so. Thus far they are similar. But when we come to the summing up, we find that the former claims, as one part of the combination, the forming of the top of the standard for brace and draft, without repeating how it is to be formed for that purpose, but on the contrary, expressly saying, "We do not intend to confine our claim to any particular form or construction, excepting such form of the top of the standard as shall serve for brace and draft, but have given such form as we deem to be most convenient, which may be varied as is obvious."

In the case now before us, the summing up claims, as part of the manner of constructing the wheels. "with double convex plates, one convex outward, and the other inward," thus repeating the requisition of the convexity and parallelism of the plates, without any suggestion that either can be dispensed with. In the former case, the mode of forming the top of the standard seems to be of little importance, while in the latter, the mode or manner of introducing the second plate, if not of the essence of the invention, is a very material part of it. Again, in the former, the defendants had made no improvement. The change introduced by them had produced no effect, even in degree. They had not increased the utility of the instrument, nor conferred any benefit upon the public, while in the latter, the defendants contend (and for the purpose of applying the law, we must take it to be true) that they have, by their changes, produced an effect new, at least, in degree of practical utility, and conferring a substantial benefit on the public.

Will it be said that the former was a patent for a combination, and the latter for a unit or whole? Admit this change of names, yet it is conceded that the convex plates are an essential part or ingredient in this whole, without which, indeed, the patent could not stand for a moment. Why, then, should not the mode of forming them, so imperatively prescribed throughout, be deemed as essential as the mode of forming the top of the standard for brace and draft, described only in the specification, and dropped, if not disclaimed in the summing up.

That case was much stronger for the plaintiffs than is the one at bar, and might be overruled and yet leave abundant ground for the defendants to stand upon.

The plaintiff became the purchaser of the patent now in controversy in 1847. He may be presumed to have known that the manufacture of the patented article had been wholly discontinued for four years, and that the only mode by which it had ever been made was by parallel plates, convex or conical from rim to rim, and that this was the only mode described in the patent which he purchased. Would any injustice be done to him if he should not now be permitted so to extend his claim as to appropriate to himself the more beneficial mode of locating the curvature and arranging the plates introduced by the skill and labor of the defendants, ten years after the patent was granted?

On the whole, had it not been for the rule laid down in Washburn v. Gould [Case No. 17,214], I do not think I should have adopted the instructions that were given to the jury. For, notwithstanding the unfeigned respect and deference which I feel for every ruling of the circuit court at Albany, even in the haste of a jury trial, I can not say that I am satisfied with those instructions; and as they would not have been given but with a view to a revision by the supreme court, which the defendants have not had time to obtain, the injunction must be refused.

[For another case involving this patent, see Many v. Jagger, Case No. 9,055.]

MANY (WOOLCOCKS v.).    See Case No. 18,-024.

MAQUILLAN (FARMERS' LOAN & TRUST CO. v.).    See Case No. 4,668.